**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

Francisco Almeida-Leon, et al.,

    Plaintiffs,

           v.                         **Civil No. 16-1394 (SEC)**

WM Capital Management, Inc., et al.,

    Defendants.

## OPINION & ORDER

Before the Court stands a motion to dismiss filed by the Federal Deposit Insurance Corporation (FDIC). See Docket # 23. The motion is granted.

**I.    Background**

In order to clarify the complicated series of events that give rise to this action, the Court has incorporated allegations drawn from the complaints filed in other cases between the parties. Nevertheless, for purposes of resolving the motion to dismiss, the Court takes as true only the facts alleged in the complaint at bar.

Nearly a decade ago, Plaintiffs Juan Almeida and his brother Francisco (jointly, the Almeidas) obtained a credit line of approximately $2.6 million from RG Premier Bank of Puerto Rico (RG). Through that loan, the Almeidas facilitated financing for a third party, Emerito Estrada (Estrada), who had not been able to obtain financing for his car dealership business directly from RG. See Almeida-León, et al. v. R-G Premiere Bank of Puerto Rico, Civil No. 10-2209 (JAG), Amended Complaint at ¶ 4.11, Docket # 56. In exchange for their financial assistance, an RG executive promised to help the Almeidas in fast-tracking a construction loan application. As an

added bonus, the Almeidas would receive interest on the loan. Id. For his part, Estrada secured the credit line through various mortgage notes (guaranteed by deeds) for properties located in Puerto Rico. Id. at ¶ 4.13.

The Almeidas would later explain that they felt pressured to lend to Estrada since it was the only way to obtain the fast-track approval of their construction loan. See Id. at ¶ 4.12. The FDIC, on the other hand, maintains that this arrangement was a "highly questionable" straw borrower scheme perpetrated by the Almeida brothers. See Docket # 18, p. 3. Whatever the case, Estrada ended up defaulting on his obligations shortly after the transaction took place. And from the default, a lengthy series of lawsuits ensued.

RG failed in early 2010, and had its assets and deposits seized by the FDIC. Acting as RG's receiver, the FDIC filed a lawsuit against Juan Almeida in December 2012 seeking to recover on the default, and to execute the mortgage notes that served as collateral (the "Federal Suit"). Juan never answered the complaint, and so the district court entered a default judgment in favor of the FDIC in September 2013. See FDIC v. Almeida-León, Civil No. 12-2025 (FAB), Docket # 25. The FDIC thus became judgment creditor of Juan Almeida in the amount of $2,828,850 (hereinafter referred to as the "Judgment Credit"). The district court also ordered the execution of the mortgage notes.

Meanwhile, another lawsuit brewed in state court. Francisco Almeida and his wife Wanda Cruz sued Estrada for collection of monies based on Estrada's default.[1] In October 2011, the state court rendered Judgment against Estrada (the "State Court Judgment"). See Docket # 21, ¶ 6. According to Plaintiffs, Juan Almeida later received "an undivided co-ownership" with respect to half of the assets obtained through the State Court Judgment. Id. at ¶ 7.

Several months after the entry of judgment in the Federal Suit, the FDIC discovered that Juan had divested his interest in the aforementioned mortgage notes to

---

[1] Curiously, Juan was not a plaintiff in that suit.

Francisco and an entity under his control, Tenerife LLC. See Docket # 18 at p. 3. These were the same notes that secured the Judgment Credit and that formed the basis of Francisco and Wanda's suit against Estrada in state court. The FDIC also found out that the properties subject to the notes were scheduled to be auctioned off later that month pursuant to the State Court Judgment obtained by Francisco and Wanda.

Realizing that the collateral securing its judgment was in jeopardy, the FDIC quickly petitioned the district court for a temporary restraining order to halt the auction. The FDIC argued that Juan had fraudulently transferred those assets to his brother in an effort to place them beyond the FDIC's reach. The district court immediately granted the TRO and ordered the cancellation of the auction. See FDIC v. Almeida-León, Civil No. 12-2025 (FAB), Docket ## 27, 28. After weeks of negotiations, the FDIC reached an agreement with the Almeidas and Tenerife LLC (the "Agreement"). In a nutshell, the FDIC was assigned Juan Almeida's 50% interest in the State Court Judgment for the purpose of paying off his debt pursuant to the Federal Judgment. The parties also agreed to execute the State Court Judgment through the public sale of the mortgaged property.

Under the Agreement, the FDIC bound itself to conduct an environmental study of the properties. See Docket # 21, ¶ 19-22. Once the study was completed, the auction would proceed. The Almeidas, interested in maximizing the proceeds of the properties so as to pay off the FDIC in full, obtained various buyers and tenants for the properties subject to auction. Three months went by, however, without the FDIC conducting the promised study. In October 2014, the Almeidas sent a letter admonishing the FDIC for excessive delays and demanding that the study proceed immediately. Still, the FDIC remained silent, failed to complete the study, and further obstructed the execution of the judgment. That was the status quo for nearly a year. For that period, Plaintiffs allege they were deprived by the FDIC from receiving the substantial arrears of the property, which they estimate to be more than $10,000 per month. Id.

In January 2016, Francisco Almeida sent a letter to the FDIC reiterating that the latter had breached the Agreement for failure to perform the environmental study. See id., ¶¶ 27-32. Counsel for the FDIC contacted the Almeidas and informed them that the FDIC had sold its Judgment Credit and the 50% participation in the State Court Judgment acquired through the assignment. However, since the FDIC's counsel also represented the buyer, he informed the Almeidas that they could proceed with their claims through him.

Initially, the FDIC's counsel refused to disclose the identity of the third party who had purchased the assets from the FDIC. After some digging, the third party was identified as WM Capital Management, Inc. ("WM Capital"). See id., ¶ 33-40. Plaintiffs estimate that WM Capital paid around $92,840.71 to acquire the assets in question from the FDIC. The Almeidas then told the FDIC's counsel that they were invoking their right to redeem the sale under the theories of co-owner and litigious credit redemption.

The Almeidas formalized their grievances by filing a proof of claim with the FDIC. Also, because WM Capital agreed to "assume all of [the FDIC's] duties, obligations and liabilities]" under the purchase agreement, Plaintiffs filed suit against WM Capital in state court. The latter promptly removed the case to this Court.

WM Capital now moves to dismiss Plaintiffs' co-owner and litigious credit redemption claims, but leaves the breach of contract claim for summary judgment. In response to WM Capital's motion, Plaintiffs concede that the litigious redemption claim has no merit. The same shall therefore be dismissed with prejudice.[2] And, for the reasons that follow, the Court agrees with WM Capital that the co-owner redemption claim shares the same fate.

---

[2] In its opening brief, WM Capital argued that the enforcement of any redemption claim against WM Capital would violate the Financial Institutions Reform and Recovery Act ("FIRREA"). Given that Plaintiffs abandoned the litigious credit claim, the argument persists only as to the co-owner redemption claim. The problem is that while WM Capital's preemption argument is well briefed as to the former, the same cannot be said as to the latter (particularly because the cases cited from other jurisdictions address litigious credit, but not co-owner, redemption claims). Still, Plaintiffs' co-owner redemption claim crumbles under its own weight, so there is no need to address the FIRREA argument.

**II.     Standard of Review**

Review of pleadings under Rule 12(b)(6) entails a two-step process. The court must first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements…[,][and then] take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citing Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011)).

**III.    Analysis**

Because this case arises in diversity, the substantive law of Puerto Rico controls. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Borges ex rel. S.M.B.W. V. Serrano–Isern, 605 F.3d 1, 6 (1st Cir. 2010).

Article 326 of the Puerto Rico Civil Code provides that, "[w]hen the ownership of a thing or of a right belongs undividedly to different persons, it is held to be owned in common." P.R. Laws Ann. t. 31, § 1271. Yet at the same time, the Civil Code "discourages and repudiates the joint ownership," which it considers a source of "disagreement" among co-owners, as well as being antithetical to the "promotion of property, industry, and wealth." See Ortiz Roberts v. Ortiz Roberts, 103 D.P.R. 628, 3 P.R. Offic. Trans. 876, 879-80 (1975) (citing 10-1 Manresa, Comentarios al Código Civil Español 508 et seq. (1969 ed.)); see also Article 333, P.R. Laws Ann. t. 31, § 1278. For that reason, co-owners (or "comuneros," as they are known in Spanish) are barred from forcing each other "to remain a part to the common ownership." Article 334, P.R. Laws Ann. t. 31, § 1279. "Each of them may, at any time, demand the division of the thing held in common," id., or otherwise "sell, assign or mortgage" their shares. Article 333, id., § 1278.

Whenever a co-owner sells his or her participation in the commonly owned property, the remaining co-owners may choose to exercise the right of redemption over that sale. Article 1412, id., § 3922. While the Civil Code recognizes various forms of

redemption, this one in particular is known as the "retracto de comuneros," or the right of co-owner redemption. The purpose of this mechanism is the "termination of the state of [indivision]." See Ortiz Roberts, 3 P.R. Offic. Trans. at 880 (citing 4 Castán, Derecho Civil Español, Común y Foral 161-2 (1961 ed.)). It implies "the right to be subrogated, with the same conditions stipulated in the contract, in the place of the person who acquires a thing by purchase or in payment of a debt." Article 1411, P.R. Laws Ann. t. 31, § 3921. In order to exercise this right, the co-owner must reimburse the buyer with the price paid for the shares, plus any expenses incurred by the purchaser related to the sale, and any "useful and necessary expenses incurred in the thing sold." Article 1407, id., § 3912.

Plaintiffs claim that, through the assignment, the FDIC became co-owner of Juan Almeida's participation in the State Court Judgment. From the very moment the FDIC sold that asset to WM Capital, Plaintiffs contend that they could exercise the right of redemption as to that sale. If this were true, then it follows that Plaintiffs would be able to purchase the FDIC's share in the State Court Judgment for the discounted price paid by WM Capital, plus associated expenses.

The fundamental flaw with Plaintiff's claim, says WM Capital, is that a *sine qua non* requirement for the invocation of Article 1412 – that of co-ownership – is missing. WM Capital asserts that the assignment of Juan Almeida's rights in the State Court Judgment was done pursuant to Article 1129 of the Civil Code. Such an assignment, argues WM Capital, did not create a transfer of ownership but rather a right to administer the ceded assets with the ultimate purpose of liquidation in order to satisfy the Judgment Credit. The Court agrees.

The Civil Code recognizes various mechanisms through which a debtor may extinguish an obligation by providing the creditor with an alternate form of payment. One of these is the "dación en pago" (loosely translated as payment in kind), where the debtor tenders an asset or service that is different in kind to the one originally promised to the creditor. See Trabal Morales v. Ruiz Rodríguez, 125 D.P.R. 340, 345

(1990).[3] If the creditor accepts the proffer, the obligation is extinguished. Similarly, Article 1129 of the Civil Code (entitled "pago por cesión de bienes") allows the debtor to "assign his property to creditors in payment of his debts." See P.R. Laws Ann. t. 31, § 3179. But under this method, the "assignment releases the former from liability <u>only to the net amount of the property assigned</u>, unless there is an agreement to the contrary." Id. (emphasis added). As is discussed further below, while assignments made as a "dación en pago" have the effect of transferring ownership for purposes of extinguishing a debt, those made under Article 1129 do not.

The parties agree that Juan Almeida assigned his participation in the State Court Judgment in order to satisfy the FDIC's Judgment Credit. The question of whether Plaintiffs are entitled to redeem the FDIC's sale of its participation in the State Court Judgment to WM Capital turns on whether, through the original Agreement, the FDIC became "co-owner" of that asset.[4] The Court thus looks to the Agreement.[5]

Section 3 of the Agreement is entitled "Procedure to Satisfy Judgment." There, the Almeidas and Tenerife LLC assigned an "undivided one-half interest" to the FDIC in the mortgage notes that Estrada had provided as collateral. See Docket # 1-7, p. 3. The next paragraph explains that the notes were ceded as an "assignment for payment" of the FDIC's judgment credit. Id. at p. 4, ¶ 3.1.3 (emphasis added). In a parenthetical, however, the Agreement says that the assignment should be considered as a "Dación o Cesión para Pago." Id. Concededly, there is some tension here because the Agreement appears to conflate the words "dación" and "cesión" – which, as explained above,

---

[3] The Civil Code does not contain an explicit definition of the "dación en pago," but rather alludes to it in an indirect manner. Trabal Morales, 125 D.P.R. at 345.

[4] Plaintiffs aimed their now-defunct litigious credit redemption claim at the sale of the Judgment Credit, while the co-owner redemption claim targeted the sale of the FDIC's participation in the State Court Judgment.

[5] Normally, materials outside the complaint may not be considered at this stage. Excepted from this rule are, among other things, "documents central to plaintiffs' claim" and "documents sufficiently referred to in the complaint." See Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). In this case, Plaintiffs' claim for co-owner redemption is grounded on the Agreement. Indeed, the Amended Complaint makes substantial reference and cites directly to the text of the Agreement. The Agreement also appears to have been attached to the original complaint filed in state court. See Docket # 1-7; Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Accordingly, the Court may consider the full text of the Agreement at this juncture.

relate to two distinct juridical figures. In principle, this tension could be swept away since the Agreement provides that, "if there appears to be an inconsistent interpretation of the terms of this agreement between the Spanish and English version, the English version shall prevail" – and there is no such inconsistency in the English text. See Docket # 23, p. 13.

Regardless, as WM Capital argues, "the prepositions in the Agreement clarifying that this is an assignment 'for' payment and not 'in' payment make all the difference." See Docket # 23, p. 7. These prepositions reflect the purpose of the transaction, which was to liquidate the assets in order to satisfy the judgment credit. That objective, as discussed above, lines up exactly with the characteristics of assignments conducted through Article 1129.

The rest of the contract, furthermore, clearly supports this interpretation. Indeed, the Agreement never states that the judgment credit would be extinguished by operation of the assignment alone. Instead, in paragraph 3.1.7, the parties agreed that if the minimum bid for the properties was met at the auction, "the proceeds of such sale up to the full amount of the Judgment will be immediately paid first to the [FDIC] as full satisfaction of the Judgment." Docket # 1-7, p. 5. The FDIC would then "deliver […] any excess sale proceeds" to Plaintiffs. Id. Again, this is exactly how assignments under Article 1129 work. See Docket # 23-1 (Puig Brutau, *Fundamentos de Derecho Civil*, Tomo 1, Vol. II, 4th Ed., Derecho General de las Obligaciones, (Barcelona, 1998), p. 312 (stating that, under Article 1129, "extinction in payment will only be, totally or partially, produced after the liquidation and distribution of the amount obtained toward payment of the credits.")).

Under Puerto Rico law, if "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." Article 1233, P.R. Laws Ann. t. 31, § 3471; see generally Grifols, Inc., Grifols USA, LLC v. Caribe RX Serv., Inc., 2016 TSPR 147 (2016) (concurring

opinion issued by Justice Anabelle Rodríguez). Here, there is no doubt that Juan Almeida performed a payment by the assignment of property under Article 1129.

Finally, we arrive at the core of the parties' dispute. Though the Puerto Rico Supreme Court has not addressed the question of whether assignments under Article 1129 imply a transfer of ownership, Spanish treatise writers and commentators have.[6] Concerning the legal relationship that exists between parties under such an assignment, Puig Brutau explains that:

> [t]here is no acquisition by the creditors of the ownership of the assigned property; at least, they do not become individual owners of the assigned property. The extinction of the debts to the extent allowed by the net amount obtained with the disposition of the assigned property, implies that the property will be liquidated. The creditors take over the property as liquidators of the debtor's assets and with the fixed purpose of applying the amount obtained to the extinction of the debts.

See Docket # 23-1 (Puig Brutau, *Fundamentos de Derecho Civil*, Tomo 1, Vol. II, 4th Ed., Derecho General de las Obligaciones, (Barcelona, 1998), p. 312-313). All sources consulted agree that, fundamentally, the purpose of Article 1129 is the liquidation of the assets in order to satisfy the creditor's debt. Id. For that purpose, no transfer of ownership is implied. According to the Spanish Supreme Court, the "debtor confers upon the creditors the possession and administration of the property in benefit of the transferees, and a mandate to proceed with the sale and payment of their respective credits, operations that do not suppose a change of ownership, since they can be carried out by means of the simple exercise of the stated faculties." Id. at p. 314 (citing Spanish Supreme Court Judgment of May 11, 1912) (emphasis added); see also id., (citing Spanish Supreme Court Judgment of March 13, 1953) (reaffirming that Article 1129 assignments occur "without transmission of ownership"). So, since the

---

[6] Under Puerto Rico's Civil law tradition, these treatises are considered valid sources of law, especially when they serve to explain and clarify concepts in the Civil Code. The same can be said of Spanish Supreme Court decisions, or "sentencias," interpreting analogous articles in its Civil Code. Given that these sources are in consensus, they provide sufficient guidance for a reasonable prediction on how the Puerto Rico Supreme Court would rule on this issue.

Agreement contained an assignment pursuant to Article 1129, the FDIC never became a co-owner and thus Plaintiffs' co-owner redemption claim fails as a matter of law.[7]

Plaintiffs, however, deny that the assignment was performed under Article 1129. Instead, they sustain that if the assignment is made to a single creditor (here, the FDIC), other provisions of the Civil Code govern and provide that ownership does indeed transfer. In support of this argument, Plaintiffs first highlight that Article 1129 refers to creditors in plural. See P.R. Laws Ann. t. 31, § 3179 (the debtor may "assign his property to creditors in payment of his debts.") (emphasis added). Also, the last bit of Article 1129 says that "[a]greements entered into between the debtor and his creditors with regard to the effect of an assignment shall be made in accordance with the provisions of §§ 5171 et seq. of this title and with those of the Law of Civil Procedure." Id. According to Plaintiffs, these are references to the insolvency laws of Spain. In bankruptcy, multiple creditors may have different priorities as to the debt. As their argument goes, an assignment made under Article 1129 cannot transfer ownership until a court reviews their respective priorities to the debt. Since none of these concerns are present in the single-creditor scenario, Plaintiffs contend that the assignment must be interpreted under some other provision of the Civil Code.

While Plaintiffs' theory is creative, it ultimately fails to hold water. For starters, it is an "elementary rule of hermeneutics, except when something else appears from the context of a statute, [that] the singular includes the plural, and vice versa, the masculine includes the feminine." Ex parte J.A.A., 104 D.P.R. 551, 4 P.R. Offic. Trans. 767, 776 (1976). By its very terms, Article 1129 does not explicitly exclude the single-creditor scenario. Neither can it be said that Article 1129 implicitly excludes such a scenario. And echoing a 1953 Spanish Supreme Court decision finding that Article 1129 was available in a single-creditor scenario, Puig Brutau confirms that "the extrajudicial agreement of assignment of property can be issued with the totality of the

---

[7] The fact that the FDIC later sold those assets to WM Capital is irrelevant since, if the FDIC was never an owner, it could not possibly have transferred ownership to WM Capital through the sale.

creditors or with only some <u>or one of them</u>." See Docket # 23-1 at 315. The word "creditors" must therefore be interpreted to include the singular form.

Alternatively, Plaintiffs marshal a contorted reading of another treatise for the proposition that Article 1129 may only be invoked in the context of a judicial action and not through private contract. This argument is self-consistent in the sense that, as Plaintiffs previously assert, judicial action is necessary to process the claims of multiple creditors in order to protect their priorities. But that issue was also settled by the same Spanish Supreme Court decision cited above. As the court explained, the references in Article 1129 to the insolvency laws apply only when the debtor is bankrupt and is considering assigning property to a multiplicity of creditors. See Docket # 23-1 at 315. On the flipside, Article 1129's mechanism <u>is</u> available extrajudicially, with the caveat that it is a contract subject to the strictures of the Civil Code. See id.[8]

Next, Plaintiffs appear to challenge the validity of the FDIC's sale to WM Capital. Misinterpreting several commentators yet again, Plaintiffs say that when an "assignment does not convey title, it is necessary to execute a Power of Attorney" to enable the sale of the asset. See Docket # 27 at p. 38. Since Plaintiffs never executed such a power, they argue, the FDIC could not have sold anything to WM Capital. As a threshold matter, the Court is hard pressed to see the relevance of this argument here. If the sale were indeed invalid, then Plaintiffs' co-owner redemption claim would fail at the outset. In any event, Plaintiffs' contention is at odds with the law. As WM Capital argues, the Civil Code recognizes a difference between a power of attorney and a

---

[8] Specifically, the court stated:
> "the extrajudicial assignment is ruled pursuant to the provisions of the agreement authorized by art. 1.175 of the civil code in the first place, and supplemented by the general rules of contracts, without the forcible application of the rules of civil judicial procedure for concurrence of creditors or bankruptcy, that will only apply in case of judicial assignment or property surrendered by the debtor in front of a Judge in favor of a plurality of creditors, <u>circumstance which is not present in the current case, in which there is only one known creditor</u>, nor are the provisions about concurrence and preference in the order of creditors to which article 1.175 refers applicable in case a plurality of creditors exists, nor, for the same reason, is it essential in the assignment of property by means of contract that the sale take place in public auction…".

Id. (emphasis added). The highlighted portion also works against Plaintiffs' prior argument.

mandate. The latter needs no formal document and may be implied even by oral agreement. And, as Diez Picazo states, Article 1129 grants creditors "special legitimacy to carry out dispositive acts over the debtor's property in their own interest." See Docket # 23-1 at 313. The mandate in favor of the creditor to liquidate the assets and recover on the debt is therefore implicit in the text of Article 1129. Thus, no power need have been executed.[9]

The last arrow in Plaintiffs' quiver comes tipped with the doctrine of judicial estoppel. Specifically, Plaintiffs argue that WM Capital is estopped from arguing that it is not a co-owner due to two motions filed before the state court. This arrow lands well short of the mark.

From the outset, Plaintiffs fail to spell out their argument in favor of estoppel "squarely and distinctly." Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988). Indeed, the argument looks much like an afterthought – part of it is buried in a footnote, and the other is dragged along at the brief's conclusion. Moreover, a showing of judicial estoppel must be a strong one and requires the proponent to prove, "by competent evidence or inescapable inference, that the prior court adopted or relied upon the previous inconsistent assertion." Knowlton v. Shaw, 704 F.3d 1, 11 (1st Cir. 2013). Yet Plaintiffs' discussion of judicial estoppel is woefully underdeveloped, even in spite of their oversized brief. The argument is therefore waived. Even if it were not, the contention is meritless.

The doctrine of judicial estoppel is equitable in nature, and prevents "a litigant from taking a litigation position that is inconsistent with a litigation position successfully asserted by him […] in an earlier court proceeding." Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010) (citing InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003)). This doctrine protects the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." New

---

[9] For the well-stated reasons in WM Capital's reply, the Court summarily rejects Plaintiffs' argument relating to the alleged "trust obligation."

Hampshire v. Maine, 532 U.S. 742, 750 (2001) (citations omitted). Courts typically require the concurrence of three elements for judicial estoppel to apply: 1) the party's current position is clearly inconsistent with its prior position; 2) the party "succeeded in persuading a court to accept the earlier position;" and 3) the party "would stand to derive an unfair advantage if the new position is accepted by the court." Id. (citations omitted). None of these are present here.

Regarding the first element, the First Circuit has held that "the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive." Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) (citing Faigin v. Kelly, 184 F.3d 67, 82 (1st Cir. 1999)). However, the motions submitted by Plaintiffs do not show that either the FDIC or WM Capital took mutually exclusive or inconsistent positions between the case in state court and this one.

Plaintiffs first point to WM Capital's motion to substitute itself for the FDIC in the state court action pursuant to the purchase agreement. After Plaintiffs filed an opposition, WM Capital submitted the reply brief which serves as the basis for Plaintiffs' argument. There, WM Capital stated that the Agreement provided "for the substitution of the [FDIC] as owner in a 50% of the note object of the present litigation." Docket # 27-1, p. 28. The Agreement itself, of course, says no such thing. Nevertheless, Plaintiffs maintain that this representation is inconsistent with the position now taken by WM Capital.

That statement, taken in isolation, could well be inconsistent with WM Capital's current position. Yet arguments assembled in a vacuum are rarely, if ever, successful. The record before the state court makes this clear.

WM Capital's motion is a follow-up to the other motion referenced by Plaintiffs, a joint motion where the FDIC, Francisco Almeida, and his wife asked the state court to join the FDIC as co-plaintiff in the case. In that motion, the FDIC never said that it was co-owner of the mortgage notes. Moreover, that motion is riddled with references and citations to the Agreement. See Docket # 27-1 at p. 97-100. Given that

WM Capital filed its motion premised on the acquisition of the rights purchased from the FDIC (which, as explained above, did not include the transfer of ownership), it is impossible to conclude that WM Capital's position was anything other than a textual *faux pas*. It is not possible to conclude that WM Capital <u>actually</u> adopted a position that is incompatible with the one it asserts here.

Second, the question of ownership was never at issue before the state court. Rather, both the FDIC and WM Capital sought to be included as co-plaintiffs in the state court case in order to execute on the mortgage notes. Indeed, the only state court order on record simply states that the FDIC would be included as plaintiff in the case. <u>See</u> 27-1 at p. 22-26. As a result, it cannot be said that either the FDIC or WM Capital "persuaded" the state court to recognize its status as "co-owner" of the asset. <u>Knowlton v. Shaw</u>, 704 F.3d 1, 11 (1st Cir. 2013) (declining to apply judicial estoppel where the court's ruling in original case did not permit "even the slightest inference" that the court relied on the allegedly inconsistent assertion).

Finally, Plaintiffs fail to explain just how WM Capital would stand to gain an <u>unfair</u> advantage from its current position. As discussed above, the whole point of the Agreement was for the FDIC to liquidate the assets received for purposes of satisfying the Judgment Credit. If anything, to apply judicial estoppel here would unfairly benefit Plaintiffs, since they would (in theory) be able to receive a windfall discount from the price paid by WM Capital – even though redemption would have been unavailable under the terms of the Agreement. WM Capital, on the other hand, would be unfairly prejudiced because it would be left holding the Judgment Credit without the corresponding collateral.

In the end, "judicial estoppel is not meant to be a trap for the unwary and should be employed sparingly when 'there is no evidence of intent to manipulate or mislead the courts.' " <u>Perry</u>, 629 F.3d at 13 (citing <u>Ryan Operations G.P. v. Santiam–Midwest Lumber Co.</u>, 81 F.3d 355, 365 (3d Cir. 1996)). To find that WM Capital is judicially estopped under these circumstances would, in effect, turn the doctrine on its head.

## IV. Conclusion

For the reasons stated above, Plaintiffs' litigious credit and co-owner redemption claims are hereby dismissed with prejudice. Judgment shall follow accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of February, 2017.

*s/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge